IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| ATP OIL & GAS CORPORATION | § | |
|  | § | CASE NO. 12-36187 |
| Debtor | § | |
|  | § | CHAPTER 7 |
|  | § | |
| RODNEY TOW, TRUSTEE | § | |
|  | § | |
| Plaintiff | § | |
|  | § | |
| v. | § | ADVERSARY NO. _____ |
|  | § | |
| T. PAUL BULMAHN, LELAND TATE, ALBERT L. REESE, JR., GEORGE R. MORRIS, KEITH R. GODWIN, PAULINE VAN DER SMAN-ARCHER, ISABEL PLUME, ROBERT M. SHIVERS III, G. ROSS FRAZER, JOHN TSCHIRHART, BURT A. ADAMS, ARTHUR H. DILLY, BRENT M. LONGNECKER, ROBERT J. KAROW, GERARD J. SWONKE, CHRIS A. BRISACK, GEORGE R. EDWARDS, AND WALTER WENDLANDT | § § § § § § § § § § § § | JURY DEMANDED |
| Defendants | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE, MARVIN ISGUR:**

COMES NOW, Rodney Tow, the Chapter 7 Trustee (the "Trustee") of the estate of ATP Oil & Gas Corporation, files this Original Complaint against T. Paul Bulmahn, Leland Tate, Albert L. Reese, Jr., George R. Morris, Keith R. Godwin, Pauline van der Sman-Archer, Isabel Plume, Robert M. Shivers III, G. Ross Frazer, John Tschirhart, Burt A. Adams, Arthur H. Dilly,

Brent M. Longnecker, Robert J. Karow, Gerard J. Swonke, Chris A. Brisack, George R. Edwards, and Walter Wendlandt, and would show the Court as follows:

## I.
## JURISDICTION AND VENUE

1. The Trustee brings this adversary proceeding pursuant to Bankruptcy Rule 7001 and sections 542, 544, of title 11 of the United States Code, as amended (the "Bankruptcy Code") and Texas state law.

2. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1409 in that the bankruptcy proceedings originated in this District.

4. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A),(O). Plaintiff does consent to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## II.
## PARTIES

5. The Plaintiff is Rodney Tow (hereinafter referred to as "Trustee", or "Plaintiff") is the duly authorized and acting chapter 7 trustee of the estate of ATP Oil & Gas Corporation (herein "ATP" or "Debtor").

6. Defendants are former officers and/or directors of the Debtor.

7. Defendant T. Paul Bulmahn is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to 5294 130th Avenue, Ocala, Florida 34482-1712.

8. Defendant Leland Tate is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to 4740 Post Oak Timber Drive, Apartment 44, Houston, Texas 77056-2238.

9. Defendant Albert L. Reese, Jr., is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to 5909 SE Caitlin CT, Mableton, Georgia 30126-3678.

10. Defendant George R. Morris is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to his place of residence or employment.

11. Defendant Keith R. Godwin is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to 13915 Canyon Maples Lane, Cypress, Texas 77429-6415.

12. Defendant Pauline van der Sman-Archer is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to 13514 Havershire Lane, Houston, Texas 77079-3406.

13. Defendant Isabel Plume is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to 7803 Del Monte Drive, Houston, Texas 77063-1940.

14. Defendant Robert M. Shivers III is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to his attorney Mark Manela, Manela Law Firm, 440 Louisiana, Suite 2300, Houston, Texas 77002.

15. Defendant G. Ross Frazer is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to 3096 Chaco Canyon Drive, College Station, Texas 77845-4549.

16. Defendant John Tschirhart is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to 13 Oak Drive, Hamilton, New York 13346-1338.

17. Burt A. Adams is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to P.O. Box 2447, Morgan City, Louisiana 70381-2447.

18. Arthur H. Dilly is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to 5004 Cedro Trail, Austin, Texas 78731.

19. Brent M. Longnecker is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to 21106 W. Kelsey Creek Trail, Cypress, Texas 77433.

20. Robert J. Karow is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to 7008 30th Way Gainesville, Florida 32608-5235.

21. Gerard J. Swonke is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to 4544 Post Oak Place Drive, Suite 350, Houston, Texas 77027-3119.

22. Chris A. Brisack is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to 6102 Inway Drive, Spring, Texas 77389-3745.

23. George R. Edwards is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to his place of residence or employment.

24. Walter Wendlandt is an individual that conducts business in this District who may be summoned to appear by mailing a copy of the summons and the Complaint to his place of residence or employment.

## III.
## FACTUAL BACKGROUND

25. ATP Oil & Gas Corporation (herein "ATP") was incorporated in Texas in 1991 and was in the business of acquisition, development and production of oil and gas properties.

26. On August 17, 2012, ATP filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

27. On June 26, 2014, the Bankruptcy Case was converted to a Chapter 7 proceeding, and Rodney Tow was appointed Trustee for ATP.

28. Defendant T. Paul Bulmahn is the former Chief Executive Officer and Chairman of the Board of Directors of ATP.

29. Defendant Leland Tate is the former President of ATP.

30. Defendant Albert L. Reese, Jr., is the former Chief Financial Officer of ATP.

31. Defendant George R. Morris is the former Chief Operating Officer of ATP.

32. Defendant Keith R. Godwin is the former Chief Accounting Officer of ATP.

33. Defendant Pauline van der Sman-Archer is the former Vice President of Administration of ATP.

34. Defendant Isabel Plume is the former Chief Compliance Officer and Corporate Secretary of ATP.

35. Defendant Robert M. Shivers III is the former Vice President of Projects of ATP.

36. Defendant G. Ross Frazer is the former Vice President of Engineering of ATP.

37. Defendant John Tschirhart is the former General Counsel of ATP.

38. Defendants Burt A. Adams, Arthur H. Dilly, Brent M. Longnecker, Robert J. Karow, Gerard J. Swonke, Chris A. Brisack, George R. Edwards, and Walter Wendlandt are former Directors of ATP.

39. At all times relevant hereto, Defendants controlled the operations and finances of ATP. Many of the Defendants were major shareholders of ATP.

40. All the Defendants are jointly and severally liable for the actions of their fellow officers and directors by reason that all either actively participated in the torts, or knew, or should have known of what the other Officers and Directors were doing or not doing and the resulting effects on ATP. However, following the Deepwater Horizon Oil Spill in the Gulf of Mexico, Defendants failed to take action to properly plan, budget or take the appropriate proactive action to lessen the damages caused by the Oil Spill and foreseeable government response and increased the amount of indebtedness.

41. On or about April 20, 2010, a well blowout on the vessel Deepwater Horizon in the Gulf of Mexico marked the beginning of what would become one of the most pervasive and devastating environmental disasters in the history of the United States. The blowout and

subsequent explosions, fire and sinking of the vessel resulted in an oil spill of unprecedented proportions.

42. The damage to offshore, marine, and coastal environments cast a shadow over the oil and gas industry and regulatory oversight effectiveness, directly impacting operators such as ATP. Oil and gas exploration, production, and routine associated activities in the Gulf of Mexico were significantly interrupted, delayed, and materially altered. Among other things, the federal government issued moratoria on new and existing deepwater drilling in the Gulf of Mexico, an expected and natural consequence of the damage from the Oil Spill. Even after the moratoria flowing naturally and foreseeable from the Oil Spill were officially lifted, drilling still could not resume quickly, as new regulations were implemented and additional inspections required.

43. For companies like ATP, who worked in the field of deepwater oil and gas development in the United States' portions of the Gulf of Mexico, the Oil Spill and its attendant consequences were so pervasive and dramatic that history is demarcated into two segments: pre-spill and post-spill reality.

44. Defendants failed to recognize the reality of the Oil Spill. Defendants failed to take actions to account for the unavoidable effects of the Oil Spill on the finances and business of ATP and instead took actions that increased ATP's damages and precipitated ATP's ultimate demise.

45. As a result of the Oil Spill, many of ATP's projected revenue streams deferred and certain revenue streams were lost entirely. While ATP's actual and projected cash flow was significantly impacted by the Oil Spill and foreseeable government response, ATP's obligations and expenses were not similarly constrained.

46.     Shortly after the Oil Spill, as early as May 2010, ATP began to have problems with liquidity due to the Oil Spill and foreseeable government response and entered the zone of insolvency, which the Directors and Officers knew.  Rather than tighten the belt, Defendants failed to appropriately adjust ATP's business practices to respond to the impending insolvency. Defendants failed to make any of the necessary, obvious and prudent strategic adjustments due the effects of the Oil Spill on ATP's future cash flows and revenues for operations.  Following, May 2010, ATP's debts remained greater than its assets at fair valuation, and its financial condition steadily worsened until its eventual demise.

47.     Defendants failed to appreciate the severity of the short and long term impacts of the oil spill.  Rather than adapt to the changed reality caused by the Oil Spill, Defendants spent ATP's money on long term projects the company could no longer afford given the impact of the Oil Spill on ATP's business.

48.     Examples of the actions by Defendants following the Oil Spill include the failure to recognize obvious problems with its Cheviot field in the North Sea.  In late 2008, ATP contracted with a shipyard in China and commenced construction of the floating production platform called "Octabuoy," that was expected to be completed in 2014.  The Octabuoy was to be deployed to ATP's Cheviot Hub in the United Kingdom's North Sea.

49.     After the Oil Spill, Defendants grossly underestimated and failed to properly manage the development costs of Cheviot and Octabuoy and substantially overestimated the reserve value of the Cheviot project.

50.     During the same time period, Defendants continued to authorize or ratify funding monies to ATP Oil & Gas (UK) Limited ("ATP UK") in connection with Cheviot and Octabuoy at a time when they knew or should have known that Cheviot was not economically viable.

51.     More specifically, between January 1, 2012 and June 30, 2012, ATP revised its reserve value for Cheviot from $702.5 million in proved undeveloped reserves to $25.5 million

52.     In that same time frame, ATP revised its reserve value for Cheviot from $1,120.1 million in probable undeveloped reserves down to $583.8 million.

53.     Ignoring these reductions, Defendants continued to authorize or ratify substantial transfers of monies to ATP UK for Cheviot and Octabuoy. In 2012, Defendants authorized or ratified more than $80 million to ATP UK in connection with the Octabuoy and Cheviot projects. This was done even though Defendants knew or should have known that because of the Oil Spill and foreseeable government response ATP was not in a financial position to fund that type of long term project.

54.     Another example is Defendants' authorization or ratification of investments in and funding of ATP's subsidiaries for drilling and exploration in the Eastern Mediterranean Sea despite ATP's liquidity problems caused by the Oil Spill and foreseeable government response.

55.     In June 2011, Defendants authorized or ratified the funding for ATP's subsidiary ATP East Med Number 1 B.V. (herein "ATP-EM-1") to purchase 35% share of three licenses off the coast of Israel-Shimshon, Daniel East and Daniel West.  It was estimated that ATP would need to spend $250 million on those licenses before production.  ATP did not have sufficient money at that time to begin such an endeavor.  Ultimately, millions of dollars were wastefully spent, and no production ever occurred.

56.     Defendants authorized or ratified the funding for ATP's subsidiary ATP East Med Number 2 B.V. (herein "ATP-EM-2") to bid on work off the coast of Cyprus.  Millions of dollars were wastefully spent, and no licenses were ever obtained.

57. Another example of Defendants' gross mismanagement following the Oil Spill is overspending in the Gulf of Mexico on the Clipper project. As of August 2012, ATP stated that the cost of completing the Clipper would be less than $120 million. However, due in part to the changes brought about by the Oil Spill and foreseeable government response, the cost of the Clipper project ballooned mere months later to over $200 million due to Defendants' gross mismanagement.

58. Additionally, following the Oil Spill, new foreseeable regulations increased the cost of decommissioning obligations. At the same time, because of the impacts of the Oil Spill and foreseeable government response, ATP was forced to incur decommissioning obligations in the Gulf of Mexico earlier than it otherwise would have. After the Oil Spill, however, Defendants failed to provide a plan to address ATP's decommissioning obligations on producing and idle iron associated with ATP's marine operations in the Gulf of Mexico. A prudent operator holds money in reserve to account for the statutory responsibility to pay the costs of decommissioning wells. These requirements are commonly known in the industry and, in the wake of the Oil Spill, Defendants ignored them to the extreme detriment of ATP.

59. Defendants authorized or ratified this failure of ATP to have no money in reserve to pay these costs after the Oil Spill. This resulted in approximately $120 million in liability for ATP to the Bureau of Ocean Energy Management (herein "BOEM") and additional liability to other creditors. Because Defendants failed to have a plan to pay these costs, BOEM stripped ATP of its ability to operate in the Gulf of Mexico.

60. Faced with a need for cash due to the lost and deferred revenue caused by the Oil Spill and their wasteful spending and mismanagement of the company on numerous projects that failed to adequately recognize the severity of the effects of the Oil Spill, Defendants authorized

or ratified desperate financing of over $600 million to provide ATP short term cash at the expense of its long term viability.  Defendants authorized or ratified the over-monetization of in-ground hydrocarbons through the purported sale of net profits interests (herein "NPI") and overriding royalty interests (herein "ORRI") in order to pay past due obligations.  Defendants burdened ATP's current and long-term assets for immediate cash to continue operations after the Oil Spill to ATP's detriment.

61.     The Trustee's position is that these were not truly NPIs or ORRIs, but were loans or executory contracts.  This disguised financing was done to evade the requirements of a credit agreement ATP entered into with Credit Suisse after the Oil Spill.  ATP had no authority to borrow money with which to fund the capital development of its properties, so it called the loans NPI or ORRI to hide them from Credit Suisse.

62.     Whether properly considered loans, NPI and ORRI is irrelevant with respect to the actions of Defendants in authorizing or ratifying these transactions.  Defendants ignored ATP's future in responding to the impacts of the Oil Spill and foreseeable government response, worsening the inevitable damage resulting from the Oil Spill and destroying any long term prospects for the company.  Defendants crippled ATP's ability to profit in the future and cannibalized its assets for short term gains because of the need for immediate cash created by lost and deferred revenue and increased costs due to the Oil Spill and foreseeable government response.  The burden placed on these assets by Defendants was so great that they could only be sold for de minimus value when ATP filed for bankruptcy.

63.     Another example of mismanagement and/or gross mismanagement following the Oil Spill relates to contracts ATP had with certain vendors.  Defendants authorized or ratified ATP's contract with Bluewater Industries (herein "BWI") on various projects even though it was

known or should have been known that BWI was unable and unqualified to properly perform the work.

64. The BWI contracts were completely one-sided in BWI's favor and not the customary contracts seen in the industry. Defendants gave these contracts to BWI without soliciting bids from other companies.

65. BWI continually had cost overruns on projects, the cost of which were all allocated to ATP and the lawyers and managers of ATP failed to manage these overruns or contract in a way to allocate these to BWI.

66. From March 2010 through July 2012, Defendants authorized or ratified the continual contracting and rental of a drilling rig from Nabors Offshore Corporation ("Nabors") at a daily rate of $100,000.

67. Invoices for services rendered by Nabors show that the drilling rig was not used for drilling but for services that could have been provided via other vastly less expensive means.

68. Even when the filing of bankruptcy was imminent, Defendants continued to spend ATP's money in a haphazard and/or self-dealing manner. On or about July 2, 2012, Defendants authorized or ratified the payment of preferred stock dividend of $1.99 per share on Series B shares. The total paid was over $7 million.

69. This dividend was paid at a time ATP was contemplating filing its Chapter 11 bankruptcy case.

70. Defendants and ATP's lawyers failed to attempt to mitigate their damages on lawsuits and claims against the company. In February 2013, ATP was sued by the United States of America in Civil Action 13-cv-00262-NJB-KWR, pending in the Eastern District of Louisiana related to unlawful discharges of oil and an unpermitted chemical dispersant from ATP's floating

oil and gas production platform, the "ATP Innovator," into the Gulf of Mexico. Upon information and belief, any spill that occurred was caused by ATP's subcontractor Greystar.

71. Despite having insurance coverage for the allegation in that lawsuit, Defendants and their counsel failed to timely make a claim to ATP's primary or additional insurers. The failure to make a timely claim has caused ATP to incur unnecessary attorney's fees and potential liability that would be borne by its insurer had a claim been timely made.

72. Defendants authorized or ratified the payment of excessive compensation and bonuses to ATP's directors and officers that was not commiserate with their actual performance.

73. In 2010, Defendants authorized or ratified the purchase of Volvo automobiles for all or substantially all employees of ATP and the payment of expenses of flying such employees to Sweden to view such automobiles.

74. The Oil Spill devastated ATP's ability to operate. Rather than adjust ATP's business to reflect the damage done by BP, Defendants continued to spend money on long term projects and spent the cash that ATP desperately needed to survive the BP disaster. The above items are just some of the examples of how Defendants ignored the problems ATP was facing to the detriment of ATP and its creditors.

## IV.
## CAUSE OF ACTION ONE—BREACH OF DUTY OF CARE & FIDUCIARY DUTY

75. Plaintiff restates and incorporates by this reference the allegations contained in paragraphs 25 through 74 above.

76. As officers and/or directors of ATP, Defendants owed it a fiduciary duty of care to exercise reasonable care, skill, and diligence in fulfilling their responsibilities. This duty required them to exercise the care and skill reasonably expected from persons having their knowledge, expertise, and experience in the industry.

77. Once ATP entered the zone of insolvency, Defendants owed a fiduciary duty to both ATP and its creditors to pay, satisfy, or discharge all their debts, liabilities and obligations from the assets of the corporation or make adequate provision for the payment satisfaction or discharge of the obligations in a just and equitable fashion.

78. Defendants acted in ways that constituted negligence, gross negligence, or intentional misconduct. Defendants breached their fiduciary duty to ATP and its creditors by causing it to enter into financial transactions for which ATP was inadequately capitalized, and which were of no benefit to ATP.

79. Defendants also breached their fiduciary duty by accepting benefits (in an excessive and unreasonable amount) from ATP at a time when they knew that ATP was insolvent.

80. Defendants have undertaken acts and omissions that are either reckless, grossly negligent or negligent and constitute breaches of fiduciary duty, breaches of the duty of loyalty or waste by virtue of the failure to recognize and adjust to the damage to ATP caused by BP and the Oil Spill.

81. Defendants failed to act as an ordinarily prudent person would under similar circumstances, failed to act on an informed basis, in good faith, and in a manner they believed to be in the best interest of ATP in its financial decisions outlined above.

82. Defendants over-monetized ATP's assets to maintain the false appearance of standard operations in the face of growing illiquidity.

83. Defendants refused to exercise controls and management over spending and uses of cash on capital and daily operational costs.

84. Defendants made decisions and authorized or ratified transactions that resulted in deepening insolvency of ATP.

85. Defendants made decisions and authorized or ratified transactions that resulted in claims that exacerbated existing stretched obligations to creditors.

86. Defendants failed to follow the corporate formalities of ATP, allowed the Chief Executive Officer to act outside the scope of his authority unchecked, and sat idly by while he acted against the interests of ATP.

87. These actions depleted ATP of critical cash and damaged ATP and/or its creditors. As a result of the breach of fiduciary duty by Defendants, ATP and its creditors have suffered damages.

## V.
## CAUSE OF ACTION TWO--NEGLIGENCE

88. Plaintiff restates and incorporates by this reference the allegations contained in paragraphs 25 through 87 above.

89. As Officers and/or Directors of ATP, Defendants owed ATP a duty to act as an ordinarily prudent officer and/or director in managing ATP's affairs. Once ATP entered the zone of insolvency, this duty extended to its creditors.

90. Defendants breached their duty to ATP and its creditors by failing to act as reasonably prudent officers and/or directors. The actions of Defendants caused ATP and its creditors damages.

## VI.
## CAUSE OF ACTION THREE --LEGAL MALPRACTICE

91. Plaintiff restates and incorporates by this reference the allegations contained in paragraphs 25 through 90 above.

92. Defendant Tschirhart was the general counsel for ATP. Defendant Tschirhart and ATP established an attorney-client relationship.

93. Defendant Tschirhart breached the standard of care that arose from the attorney-client relationship by failing to make a claim to ATP's insurer, Greystar or Greystar's insurer for Civil Action 13-cv-00262-NJB-KWR, pending in the Eastern District of Louisiana. A reasonable and prudent attorney would have timely made the claim to protect ATP.

94. Defendant Tschirhart breached the standard of care that arose from the attorney-client relationship by not advising the other officers and directors of ATP of the terms of the BWI and Nabors contracts. A reasonable and prudent attorney would have advised the client against entering into either of those contracts.

95. Defendant Tschirhart's breach of the standard of care proximately caused injury to ATP which resulted in damages to ATP.

## VII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff Rodney Tow, the Chapter 7 Trustee (the "Trustee") of the estate of ATP Oil & Gas Corporation asks that the Court issue citation for Defendants T. Paul Bulmahn, Leland Tate, Albert L. Reese, Jr., George R. Morris, Keith R. Godwin, Pauline van der Sman-Archer, Isabel Plume, Robert M. Shivers III, G. Ross Frazer, John Tschirhart, Burt A. Adams, Arthur H. Dilly, Brent M. Longnecker, Robert J. Karow, Gerard J. Swonke, Chris A. Brisack, George R. Edwards, and Walter Wendlandt to appear and answer, and that Plaintiff be awarded a judgment against Defendants for actual damages and exemplary damages caused by their breaches of fiduciary duties and general common law duties to ATP and its creditors.

Respectfully Submitted,

By: */s/ T. Micah Dortch*
**TIMOTHY MICAH DORTCH**
State Bar No. 24044981
SDTX Bar No. 630903

**COOPER & SCULLY, P.C.**
900 Jackson Street, Suite 100
Dallas, Texas  75202
Telephone:  (214) 712-9500
Facsimile:  (214) 712-9540
Micah.Dortch@cooperscully.com

**ATTORNEY IN CHARGE FOR PLAINTIFF RODNEY TOW, TRUSTEE**

**OF COUNSEL**:

R. Brent Cooper
State Bar No. 04783250
SDTX Bar No. 18271
**COOPER & SCULLY, P.C.**
900 Jackson Street, Suite 100
Dallas, Texas  75202
Telephone:  (214) 712-9500
Facsimile:  (214) 712-9540
Brent.Cooper@cooperscully.com

Christopher D. Lindstrom
State Bar No. 24032671
SDTX Bar No.:  33525
**COOPER & SCULLY, P.C.**
700 Louisiana, Suite 3850
Houston, Texas  77002
Telephone:  (713) 236-6800
Facsimile:  (713) 236-6880
Chris.Lindstrom@cooperscully.com